**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Jessica K. and Kyle K., individually and on behalf of S.K., | : | |
| Plaintiffs, | : | |
| v. | : | Civil Action No. 2:26-cv-9010 |
| Nazareth Area School District, | : | |
| Defendant. | : | |

# COMPLAINT

1. Plaintiffs Jessica K. and Kyle K. (hereinafter "Parents") bring this action under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*; Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794 *et seq.*; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*; and 42 U.S.C. § 1983 (Section 1983).

2. Parents, individually and on behalf of their child, S.K., filed a special education due process complaint against the Nazareth Area School District on February 11, 2026, seeking an award of compensatory education.

3. Parents filed the complaint because the District failed to provide S.K., a child with significant behavioral, socio-emotional, and academic needs, a free appropriate public education (FAPE) and otherwise discriminated against S.K.

4. On April 6, 2026, Parents filed a separate complaint seeking tuition reimbursement because of the District's failure to offer S.K. a FAPE for the 2025-2026 school year. The Hearing Officer consolidated the complaints over Parents' objection on April 30, 2026.

5. In the hearing on the consolidated matters, Parents sought, among other relief,

reimbursement for an independent educational evaluation (IEE), compensatory education, and reimbursement for S.K.'s private school tuition.

6. Parents further alleged that the District's violations of S.K.'s rights reached as far back as the 2016-2017 school year, and that exceptions to the IDEA's statute of limitations applied.

7. On June 4, 2026, after two abbreviated hearing sessions, the Hearing Officer held that no exception to the IDEA statute of limitations applied. She dismissed those of Parents' claims concerning events prior to February 11, 2024, as untimely. See Exhibit A.

8. On September 23, 2026, the Hearing Officer issued her decision, attached as Exhibit B, ruling in the District's favor.

9. Parents bring this action to rectify the Hearing Officer's legal errors, reverse her decisions, and obtain sufficient relief for the District's violations of S.K.'s rights.

## JURISDICTION

10. The Court has jurisdiction over Parents' claims pursuant to 28 U.S.C. §§ 1331, and 1343, the IDEA, the ADA, Section 504, and Section 1983.

11. The Court is, pursuant to 28 U.S.C. § 1391(b), the proper venue for this action.

12. Parents have fully exhausted their administrative remedies.

## PARTIES

13. Jessica K. and Kyle K. are S.K.'s parents.

14. S.K. is a "child with a disability" within the meaning of the IDEA. 20 U.S.C. § 1401(3)(A).

15. S.K. has diagnoses of autism, attention-deficit hyperactivity disorder (ADHD) (combined presentation), oppositional defiant disorder (ODD) (early childhood onset), and unspecified depressive disorder.

16. As a result of those disabilities, S.K. is eligible for special education services under the IDEA.

17. S.K. is an "individual with a disability" within the meaning of the IDEA and ADA, and a "qualified handicapped person" within the meaning of Section 504.

18. S.K. is otherwise qualified to participate in school activities within the meaning of Section 504 and the ADA.

19. The District is a local educational agency (LEA) within the meaning of the IDEA.

20. At all relevant times, the District was the agency responsible for providing S.K. special education and related services to ensure that he received FAPE under the IDEA and Section 504.

21. The District must comply with the IDEA's requirements.

22. The District receives federal funding.

23. It therefore is a "program or activity" receiving federal financial assistance under Section 504.

24. The District must comply with the requirements of Section 504.

25. The District is a "public entity" under the ADA.

26. The District must comply with the requirements of the ADA.

## STATUTORY AND REGULATORY BACKGROUND

27. Congress passed the IDEA so that "children with disabilities . . . have access to a free appropriate public education." 20 U.S.C. § 1400(c)(3).

28. As the LEA, the District has an obligation under the IDEA and Section 504 to identify and evaluate students that it reasonably suspects have a qualifying disability and need special education or related services. 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 104.32. Once the District

is "on notice" of student behavior that is likely to indicate a disability, it must initiate an evaluation within a reasonable time. *D.K. v. Abington School District*, 696 F.3d 233, 250 (3d Cir. 2012).

29. For students with "considerable educational potential", or twice-exceptional students, academic progress cannot serve as the sole indicator of whether a student should be evaluated. *G. D. v. Wissahickon School District*, 832 F. Supp. 2d 455, 466-67 (E.D. Pa. 2011). Behaviors indicative of a disability—including making disruptive noises, difficulty maintaining attention in class, invading the personal space of peers—can trigger a District's obligation to evaluate. *W.B. v. Matula*, 67 F.3d 484, 488, 501 (3d Cir. 1995).

30. To afford a child FAPE under the IDEA, an LEA must evaluate them and provide them with an Individualized Education Program (IEP). 20 U.S.C. § 1412(a)(4).

31. When evaluating a child, LEAs must "[u]se a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child," so that they can develop an appropriate IEP for them. 34 C.F.R. § 300.304(b)(1). The evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs." *Id.* § 300.304(c)(6).

32. IEPs must be ambitious and reasonably calculated to provide the child meaningful educational progress. *See Endrew F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 388 (2017); *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000).

33. An IEP must also include: (a) present levels of academic achievement and functional performance; (b) measurable goals designed to meet the child's needs; (c) how and when a student's progress will be monitored and measured; (d) a statement of the special education, related services, supplementary aids, and staff supports to be provided to the child; (e) an explanation of the extent, if any, the student will participate with non-disabled peers; (f) the

anticipated start date of the services outlined in the IEP and the frequency, location, and duration of services. 34 C.F.R. §300.320(a)(1)-(7).

34. Section 504 and the ADA require LEAs to provide children with disabilities FAPE. *See Andrew M. v. Del. Cnty. Off. of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007) ("[W]hen a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA" and "it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability."); *Indiana Area Sch. Dist. v. H.H.*, 428 F. Supp. 2d 361, 363 n.3 (W.D. Pa. 2006) ("[T]he Third Circuit generally has held that the same analysis under § 504 applies in determining whether a defendant's actions violate the ADA[.]").

35. Section 504 and the ADA also bar covered entities from excluding, denying benefits to, or otherwise discriminating against qualified individuals with disabilities. 29 U.S.C. § 794(a); 28 C.F.R. § 35.130.

36. Section 504 requires periodic re-evaluations for students who have been provided special education and related services. 34 C.F.R. § 104.35(d).

37. Section 504 evaluations must be tailored to assess students' specific areas of educational need and cannot merely be designed to provide a single general intelligence quotient. 34 C.F.R. § 104.35(b).

38. A covered entity engages in discrimination under the ADA and Section 504 if it fails to provide a student reasonable accommodations or supplemental services, or it denies the student "*equal opportunity* to participate in, and enjoy the benefits of, a service, program, or activity." 28 C.F.R. § 35.160(b)(1) (emphasis added).

39. The ADA extends the nondiscrimination rules of Section 504 to public regardless

of whether they receive federal funds. 42 U.S.C. § 12132.

40. Title II of the ADA obligates public schools to provide reasonable accommodations to students with disabilities. 28 C.F.R. § 35.130(b)(7)(i).

41. If an LEA denies a child FAPE or otherwise violates their rights under the IDEA, Section 504, and the ADA, the child's parents can file a due process complaint against the LEA. 20 U.S.C. § 1415(b)(7).

42. Parents have two years from when they knew, or should have known, about the alleged action that forms the basis of the due process complaint under the IDEA to file for due process. 20 U.S.C. § 1415(f)(3)(C).

43. It is not sufficient for the District to establish that Parents had knowledge of the underlying action that forms the basis of the complaint. The IDEA's statute of limitations begins to run from the date that Parents knew or should have known that the District's actions denied Student FAPE. *See E.G. v. Great Valley Sch. Dist.*, No. 16-5456, 2017 U.S. Dist. LEXIS 77920 at 17-23 (E.D. Pa. May 23, 2017); B.S. v. Shamokin Area School District, ODR No. 23640-19-20 at *23 (Jan. 21, 2021) (H.O. Waters Fleming).

44. Put differently, it is not enough for the District to show that the Parents were aware that student was failing or acting out behaviorally. Parents must know—or the District must establish that a reasonably diligent parent would have known—that the District's failure to evaluate or provide appropriate accommodations for Student's grades or behaviors violated the IDEA. *Id*.

45. The IDEA also contains two statutory tolling conditions, which extend the time Parents have to file a due process complaint. *See* 20 U.S.C. § 1415(f)(3)(D).

46. The IDEA's statute of limitations stops running where a district (1) prevents parents from timely requesting a due process hearing because the LEA by making specific misrepresentations that it resolved the problem forming the basis of the complaint or (2) withholds information it is required to provide Parent under the IDEA. *Id.*

47. One of the documents that LEAs are required to provide Parents when Parents request an evaluation is a copy of the IDEA's procedural safeguards notice. *See* 34 C.F.R. § 300.504(a)(1).

48. To request an evaluation, Parents do not need to use specific words like "evaluation" or "assessment." Moreover, questions about whether programming is available pursuant to an IEP can suffice as a request for evaluation. *See, e.g., Charlotte-Mecklenburg Cnty. Bd. of Ed. v. Brady*, 66 F.4th 205, 212 (4th Cir. 2023); *M.D. v. Colonial Sch. Dist.*, 539 F. Supp. 3d 380 (E.D. Pa. 2021).

49. When an LEA fails to provide Parents the procedural safeguards when the IDEA requires giving them a copy, it has withheld information it is required to provide Parents under the IDEA. That withholding triggers the second exception to the statute of limitations if it prevented Parents from timely requesting a due process hearing. *See* 20 U.S.C. § 1415(f)(3)(D)(ii); *D.K. v. Abington School District*, 696 F.3d 233 (3d Cir. 2012).

50. If an LEA failed to appropriately evaluate their child, a parent is entitled to an independent educational evaluation (IEE) at public expense. *See* 34 C.F.R. § 300.502(b). The LEA must consider the IEE when developing programming for the child. *See id.;* § 300.502(c)(1).

51. When an LEA denies a student FAPE or otherwise discriminates against her, her parents may be entitled to various remedies under the IDEA, Section 504, and the ADA, including compensatory education and tuition reimbursement. *See Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d

238, 249 (3d Cir. 1999) (compensatory education is an equitable remedy under the IDEA); *Florence Cnty. Sch. Dist. v. Carter*, 510 U.S. 7, 12–16 (1993) (same for tuition reimbursement).

52. Compensatory education is funding that a student can use for private tutoring, counseling, and other services that help close educational gaps arising from IDEA, Section 504, and ADA violations.

53. The preferred method for determining the amount of compensatory education to which a child is entitled is a "make whole" remedy, but in the absence of evidence allowing for the calculation of such a remedy, tribunals default to "the 'hour for hour' method, under which [the] court may award one hour of compensatory education for each hour [that] FAPE was denied." *Montgomery Cnty. Intermediate Unit No. 23 v. C.M.*, 2017 U.S. Dist. LEXIS 168709, *23–24 (E.D. Pa. Oct. 12, 2017); *See also*, *Mobley v. Lab'y Charter Sch.,* 2025 U.S. Dist. LEXIS 178177, *61 (E.D. Pa. Sep. 11, 2025).

54. In Pennsylvania, hearing officers typically use the hour-for-hour method and award a child who was denied FAPE a certain number of compensatory-education hours, which the child's parents can decide how to use. *See Connor J. v. Kennett Consol. Sch. Dist.*, 2023 U.S. Dist. LEXIS 16624, *34 (E.D. Pa. Feb. 1, 2023) (observing that "parents control the implementation of a compensatory education award"). If, for instance, a child was awarded 100 compensatory-education hours, her parent could decide to use the hours to fund 20 hours of private counseling, 20 hours of a social-skills camp, and 60 hours of math and reading tutoring.

55. The IDEA entitles a parent to tuition reimbursement for a private placement if the parent establishes (i) that their child's LEA failed to provide FAPE and (ii) that the private placement was appropriate for the child. *See Mary Courtney T. v. Sch. Dist.*, 575 F.3d 235, 242 (3d Cir. 2009). A hearing officer, however, can reduce an award of tuition reimbursement if the

hearing officer finds that the parent did not provide the LEA timely notice that she was enrolling the child in the private placement, or the hearing officer finds that the parent acted unreasonably. *See* 20 U.S.C. § 1412(a)(10)(C)(iii).

56. Whether the LEA has offered FAPE through an IEP or NOREP is a fact-intensive inquiry that is determined based on the adequacy of the offer at the time it was made, not through a reconstruction or later details designed to supplement the original offer of FAPE. Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993).

57. Parents may also seek reimbursement for the residential portion of a student's therapeutic boarding school if the residential component is necessary for educational purposes. *Lauren G. v. West Chester Area Sch. Dist.*, 906 F. Supp. 2d 375, 394 (E.D. Pa. Nov. 6, 2012). The analysis turns on whether the student's "social, emotional, medical, and educational problems … [are] so intertwined that realistically it is not possible for the court to perform the Solomon-like task of separating them". *Florence County Sch. Dist. Four v. Carter by & Through Carter*, 510 U.S. 7 (1993). *See also Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 433 (3d Cir. 2013).

58. A student's emotional needs may be so intertwined as to support their need for a therapeutic boarding school where the evidence shows that the student has therapeutic needs underlying their educational challenges or otherwise need direct interventions for their emotional needs to increase instructional time. *Lauren G.*, 906 F. Supp. 2d 375, 394-95 (finding that a therapeutic boarding school had become a "necessary ingredient for learning".)

59. Parents who prevail in a due process trial are entitled to their reasonable attorney's fees and costs under the IDEA, Section 504, and the ADA.

60. Under Section 504 and the ADA, expert witness costs are recoverable costs. *See M.W. v. Sch. Dist. of Phila.*, 2016 U.S. Dist. LEXIS 96067, *22 (E.D. Pa. July 22, 2016).

61. Where, as here, a hearing officer commits error in rendering their decisions, Parents can appeal to this Court. *See, e.g.*, 20 U.S.C. § 1415(i)(2).

**STATEMENT OF FACTS**

62. S.K. is 16 years old.

63. S.K. has autism, anxiety, depression, ADHD, and oppositional defiant disorder.

64. S.K.'s primary disability under the IDEA is Other Health Impairment because of his diagnosis of ADHD and ODD. The District identified S.K.'s secondary disability category as emotional disturbance and gifted with a disability.

65. S.K. was enrolled in the Nazareth Area School District from the kindergarten (2016-2017) till ninth grade (2025-2026).

66. The District did not identify S.K. as a student with qualifying disabilities under the IDEA until ninth grade.

67. S.K exhibited disruptive behaviors on a daily basis in kindergarten.

68. S.K. has struggled with peer interactions and relationships, anxiety, depression, and self-regulation for years.

69. The District denied S.K. FAPE and otherwise discriminated against him since his kindergarten year.

70. Over the almost ten years that he attended school in the District, S.K.'s behaviors worsened.

71. By ninth grade, S.K. not only exhibited symptoms of depression, but engaged in work avoidance behaviors, began to fail multiple classes, started eloping from home and school, and injured another student on school grounds.

72. Because of the severity of his needs by ninth grade, Parents placed S.K. in Telos Academy, a therapeutic boarding school, in December 2025 of his ninth-grade year (the 2025-2026 school year).

73. S.K. made meaningful progress at the therapeutic boarding school during the remainder of his ninth-grade year.

74. S.K. is currently attending Telos Academy. Telos representatives testified that he will have made the progress necessary to support his transition to a less restrictive environment by the end of this year.

## From Kindergarten to Ninth Grade The District Persistently Ignored S.K.'s Significant Challenges with Peers, Behavior, and Emotional Regulation

### Kindergarten: 2016-2017 school year

75. S.K. began Kindergarten in the fall of 2016. Almost immediately, parents began to receive daily calls from the District about S.K.'s behaviors. Those behaviors included (but were not limited to) difficulty maintaining focus and completing independent work; difficulty transitioning between activities; calling out and making disruptive noises during class; defying teachers and administration; wandering around and leaving the classroom without permission; and hitting, kicking, pushing, and shoving peers.

76. The District itself recognized S.K. needed additional support for his behaviors. When S.K.'s teachers voiced concern to administration, it assigned a Board-Certified Behavioral Analyst (BCBA) to S.K.'s case.

77. The District's BCBA developed a positive behavior support plan (PBSP) to support S.K.'s social and emotional needs in the classroom. But the District failed to conduct a formal

functional behavioral assessment (FBA) or notify S.K.'s parents that behavioral interventions were necessary for S.K. to access his education.

78. The District also failed to alert Parents that the behavioral plan designed by the District's BCBA was not working, even after the BCBA's express concerns about S.K.'s behaviors in February 6, 2017.

79. District employees expressed concern that S.K. may have qualifying disabilities under the IDEA, such as oppositional defiance disorder (ODD) and emotional disturbance (ED).

80. Parents sought guidance from the District for how to best support S.K. District administration advised parents to seek an independent evaluation for ADHD. At no point did the District inform parents that it could conduct an evaluation based on their concerns about his executive functioning skills, sensory needs, or behaviors.

81. An independent evaluation identified S.K. with ADHD and recommended that he receive a 504 plan.

82. Parents shared S.K.'s diagnosis with the District and inquired about additional evaluations it could administer in light of his diagnosis. They further requested a meeting to discuss S.K.'s continuing behavioral challenges in the classroom and home.

83. In response to Parent's request for an evaluation, the District responded that it evaluates for specific learning disabilities which it did not believe S.K. had. It never set up a meeting to discuss S.K.'s continued behavioral challenges.

84. In the spring of S.K.'s kindergarten year, his principal sent Parents a letter documenting the frequency of (1) his visits to the principal's office, (2) disruptive behaviors, and (3) defiance.

85. The District failed to issue a permission to evaluate, procedural safeguards, or explain parent and student rights under the IDEA, Section 504, or ADA, despite Parents' inquiry about an evaluation and the District's own concerns about S.K.'s behaviors.

86. Parents also asked about the difference between a 504 plan and an IEP. Before evaluating him for a Section 504 plan, District administration assured Parents that a 504 was sufficient to meet S.K.'s needs.

**First Grade: 2017-2018 school year**

87. On September 8, 2017, the District issued a request to evaluate S.K. for a 504 plan. That same day, it issued its evaluation.

88. The District did not evaluate all of S.K.'s areas of suspected disability as required by Section 504. It instead relied solely on the private evaluation diagnosing S.K. with ADHD to deem him eligible for 504 services.

89. Despite its own concerns about S.K.'s relationship with peers, defiant behaviors, and challenges with self-regulation, the District did not administer tests or other evaluation material necessary to assess S.K.'s areas of academic need.

90. The District's failure to identify S.K.'s qualifying disabilities resulted in 504 plans that were insufficient to provide accommodations appropriate to, and sufficient to meet, S.K.'s academic needs.

91. During S.K.'s first grade year, he continued to lie to adults, disrupt classes, distract the bus driver during transportation, bully students by calling them names like "chubby" or "dumb", hit students, spit on students, and inappropriately touch other students.

92. The District called Parents about S.K.'s behaviors and defiance on a near-daily basis.

93. In May 2018, Parents told the District that S.K.'s private providers had diagnosed him with ODD and Tourette syndrome.

94. In response, the District proposed another section 504 evaluation of S.K. Once again, however, it conducted only a record review and relied solely on the outside reports of S.K.'s disabilities. It did not propose or discuss the possibility of an IDEA evaluation.

95. After "evaluating" S.K. for a section 504 plan twice in first grade, the District never conducted evaluated Student under Section 504 ever again.

96. Even after his diagnoses of ODD and Tourette syndrome, S.K.'s May 2018 504 plan added only two additional accommodations to support his academic needs.

**Second Grade: 2018-2019 school year**

97. S.K.'s defiance continued into the second-grade year. His teacher developed behavioral interventions to address S.K.'s tendency to ignore directions, argue with classmates and teachers, and disrupt the classroom environment. The District did not include these interventions in S.K.'s 504 plan. Nor did it issue a permission to evaluate for further a further evaluation under Section 504, or an evaluation under the IDEA.

98. S.K.'s disruptive behaviors continued. For example, on transportation, S.K. continued to make loud noises, jump out of his seat, and hit other students.

99. In February 20219, the District sent Parents a permission to evaluate S.K. for gifted services. In addition to a "typical" gifted evaluation, the School Psychologist sought additional permission to administer the Behavior Assessment System for Children-Third Edition (BASC-3) to gather data on S.K.'s behaviors. The BASC-3 assesses for adaptive and maladaptive behaviors, emotional functioning, and symptoms of anxiety, depression, and ADHD. It contains no cognitive, reasoning, or intelligence tasks.

100. In or around February 2019, S.K.'s teacher noted an escalation in S.K.'s behaviors. S.K. continued to disrupt class, defy teacher directions, and bully other students.

101. The Gifted Evaluation report ultimately identified S.K. as a gifted student. It further noted that S.K. had extreme difficulty maintaining his self-control and regulating impulsive behaviors. His hyperactivity, aggression, conduct problems, and atypicality all feel within the clinically significant range for challenges within the school environment.

102. Based on the results of the evaluation, the District issued Simon a Gifted Individualized Education Plan (GIEP).

103. It failed to explain to Parents the difference between a GIEP and an IEP. The District further refused to expand on the results of the BASC-3, or further evaluate S.K.'s needs for additional academic supports through a 504 plan or IEP.

104. The District revised S.K.'s 504 plan again in May of 2019. It did not propose an updated 504 evaluation. Nor did it propose an evaluation under the IDEA. Despite S.K.'s continued challenges and recent identification as a gifted Student, the District added only one accommodation to S.K.'s 504 plan.

**Third Grade: 2019 – 2020 school year**

105. Within the first two weeks of S.K.'s third grade year, the District referred him to a weekly guidance group because of his impulsivity.

106. S.K. continued to have challenges with peers, listening to teacher instruction, and keeping his hands to himself.

107. Parents continued to receive calls from teachers and administrators stating that S.K. had continued to make distracting noises during class, bullied other students, and became overly aggressive at times.

108. In the spring of 2020, the COVID-19 pandemic began. S.K. transitioned to the virtual setting.

109. Parents reported to the District that S.K. struggled academically during this time. They had difficulty getting him to complete missing assignments or homework.

110. Parents were surprised by S.K.'s spring 2020 grades, which were in the A-B range, and by reports that his behaviors were satisfactory. Their communication with the school often reflected that S.K. had significant challenges with executive functioning that impacted his ability to attend to classes and with his peers.

111. Parents trusted, however, that S.K.'s teachers and administrators understood S.K.'s needs and provided him with the maximum amount of support they could. They did not.

112. When Parents asked for additional support, the District responded that Simon had a GIEP and a 504 plan, and that those met his needs.

113. The District revised S.K.'s 504 plan in May of 2020. The District did not add a single new accommodation despite the changes to S.K.'s learning environment and Parents' reports about their challenges with helping S.K. maintain attention through virtual instruction.

**Fourth Grade: 2020-2021 school year**

114. S.K. continued to face challenges maintaining attention in the virtual environment. He often logged out of classes or skipped them altogether his fourth-grade year.

115. When he did attend classes, teachers reported that he refused to turn on his camera.

116. Parents reported that they believed S.K. to be attending and participating in his classes, despite the virtual environment.

117. Parents consistently emailed the District about changes to S.K.'s schedule, and particularly about confusion over his class start times and links to classes.

118. Despite Parents' clear confusion regarding S.K.'s attendance and schedule and concerns regarding his executive functioning, the District did not revise S.K.'s 504 plan, propose an FBA, or otherwise make accommodations to ensure S.K.'s attendance or work completion. Instead, in May 2021, the District produced a reformatted version of S.K.'s May 2020 504 plan. S.K. started another year without the accommodations he needed to access education.

**Fifth Grade: 2021-2022 school year**

119. When S.K. returned to in-person instruction fifth grade year, the behavioral challenges previously identified by District teachers and evaluators persisted.

120. Within the first weeks of the school year, teachers identified S.K.'s behaviors as disruptive. They also noted that he failed to turn in several assignments.

121. Parents informed teachers that S.K. had an IEP. He did not. District employees failed to correct Parents misunderstanding. The District instead allowed Parents to believe S.K.'s needs were being monitored and met through his GIEP.

122. Teachers and administration repeatedly contacted Parents about S.K.'s behaviors, which now included disrupting class with loud noises, disruptive behaviors on the bus, invading the personal space of other students, bullying/calling students inappropriate names or slurs, and inappropriately touching other students.

123. The District did not propose a 504 re-evaluation or an IDEA evaluation to determine whether S.K. needed specially designed instruction to access his education.

124. In May of 2022, the District, in anticipation of S.K.'s transition to sixth grade, removed several of S.K.'s 504 accommodations.

**Sixth Grade: 2022-2023 school year**

125. In September 2022, Parents again informed the District that S.K. had an IEP. He did not. His teachers and counselors flagged Parents' confusion—but only internally. No one corrected Parents' misunderstanding.

126. S.K. continued to display challenges completing and turning work in on time, disrupting classes with inappropriate noises or comments, disruptive behaviors on the bus, arguing with teachers, ignoring instruction and re-direction, bullying other students, and displays of aggression.

127. S.K.'s challenges with impulse control, executive functioning, and social-emotional deficits all interrupted class time and impeded his ability to access education.

128. When S.K.'s social and emotional challenges continued to grow, Parents requested additional help and resources from the District.

129. The District did not propose an evaluation under section 504 or the IDEA. It instead referred Parents to outside resources for therapy and evaluations to be done at personal expense.

130. In addition to incomplete work or failing to turn in assignments, S.K. began to defy teacher instructions when redirected. He also repeatedly turned in assignments with incorrect information to avoid completing the work.

131. Despite S.K.'s behavioral and academic challenges, and Parents' request for additional support, the District's May 2023 504 revision included only one additional accommodation: Separating S.K. from other students during testing.

### Hearing Officer Fleming Committed Legal Error Both in Determining Parents' "Knew or Should Have Known" Date and in Finding that the IDEA's Statutory Tolling Provisions Did Not Apply to Parents' Claims

132. Hearing Officer Fleming's June 4, 2026, "knew or should have known" (KOSHK) ruling was legal error. As set forth below, the Hearing Officer applied the wrong standards when determining Parents' KOSHK date. She also erred in finding that the IDEA's statutory tolling provisions did not apply.

133. The KOSHK decision points to numerous dates that Parents were aware S.K. had behavioral and academic challenges in school, but it does not, as required by the prevailing case law, identify the date that Parents knew the District's actions amounted to a violation of S.K.'s rights under the IDEA.

134. Hearing Officer Fleming erred in conflating the date that Parents knew of the underlying actions with the date that Parents discovered that the District's actions violated their child's right to FAPE.

135. The Hearing Officer also erred by failing to identify a date that Parents' knew or should have known the District violated S.K.'s rights for each alleged violation. *E.G. v. Great Valley Sch. Dist.*, 2017 U.S. Dist. LEXIS 77920, *22-23 (E.D. Pa. May 23, 2017).

136. Hearing Officer Fleming further erred by finding that neither of the IDEA's tolling provisions applies to Parents' claims.

137. Parents established during the KOSHK hearings that William Mudlock, Student's kindergarten principal, and Student's teacher, suspected that S.K. had disabilities that could qualify him for services under the IDEA, such as ODD or ADHD.

138. Principal Mudlock knew that the District could evaluate for executive functioning challenges and to determine whether a student needed behavioral support to access their education.

139. As established on the record, Principal Mudlock further knew that S.K. had significant behavioral challenges that impeded S.K.'s ability to concentrate in class, that S.K. often caused disruptions in class, and that S.K. was openly defiant even when re-directed.

140. As Principal Mudlock testified, he, in response to Parents' request for an evaluation, told Parents that the District evaluates for specific learning disabilities—which he believed S.K. did not have.

141. Principal Mudlock's representation to Parents that the District did not evaluate for anything other than specific learning disabilities led Parents to believe that the District could not evaluate S.K. under the IDEA based on the concerns Parents were raising.

142. The IDEA also obligated the District to provide Parents a copy of the procedural safeguards when Parents requested that the District evaluate S.K.

143. Hearing Officer Fleming found it significant that Parents said they "may" request an evaluation from the District. She held that Parents' qualification, stating that they "may" request an evaluation rather than they are requesting an evaluation, absolved the District of its requirement to provide procedural safeguards.

144. Parents are not educational experts.

145. Hearing Officer Fleming erred by holding Parents must use specific language to trigger the District's requirement to evaluate a student or provide a copy of procedural safeguards.

146. Hearing Officer Fleming further erred by overlooking the requests for additional supports and services by Parents that were tantamount to evaluation requests.

147. Hearing Officer Fleming's reliance on the fact that the District gave Parents copies of the 504 and gifted evaluation procedural safeguards was also legal error.

148. Neither of those include the information required by 34 C.F.R. § 300.504(c).

149. Based on her erroneous decision that Parents' claims were limited to two years before the date Parents' filed their complaint, Hearing Officer Fleming granted the District's motion to limit Parents' claims and restricted Parents' presentation of evidence accordingly.

150. As the moving party, the District had the burden of proof in establishing that Parents knew or should have known that the District's actions violated students' rights more than two years before the date of filing. See, e.g., *Schaffer v. Weast*, 546 U.S. 49 (2005).

**Seventh, Eighth, and Ninth Grade: S.K., a Student whom the District Identified as Gifted, Begins Failing Multiple Classes**

**Seventh Grade: 2023-2024 school year**

151. By seventh grade, S.K.'s social and emotional challenges, inappropriate behavior at school, and defiance began to impact his grades.

152. S.K.'s IQ and the District's classification of S.K. as a gifted student confirmed that he had the capacity to learn and achieve passing grades in academic courses.

153. S.K.'s first marking period grades, however, reflected performance in the 60s-70s (Cs and Ds) across subjects.

154. Throughout the 2023-2024 school year, S.K.'s quarterly report cards continued to reflect well-below-average grades.

155. S.K. did not pass a single course during the last marking period of his seventh grade year.

156. The District acknowledged and documented that S.K. was work avoidant, defiant, argumentative, and continuing to struggle with peer relationships.

157. S.K.'s behaviors, including lying, stealing, cursing, and touching other students, were disrupting classes weekly. Some teachers reported that S.K.'s behaviors caused daily interruptions.

158. At no point during S.K.'s seventh grade year did the District suggest a section 504 re-evaluation or evaluation for IDEA services.

159. The District continued to provide S.K. with only his existing 504 plan. S.K.'s scores and behaviors seventh grade year indicated that that 504 plan was insufficient to provide the academic supports S.K. needed to access a free and appropriate public education. The District did not revise S.K.'s 504 plan, or meet to discuss the plan, until May 2024.

160. Hearing Officer Fleming acknowledged S.K.'s declining grades and increased behavioral challenges in the school environment seventh grade year. Her decision, however, erred in finding that the District's May 2024 revision to S.K.'s 504 plan was a sufficient response to his increased academic, behavioral, and social and emotional deficits.

161. Once a District is on notice that a Student may have a qualifying disability, it must evaluate that student in a timely manner. See *A.W. v. Middletown Area School District*, 2015 U.S. Dist. LEXIS 9774, at 31 (M.D. Pa. Jan. 28, 2015) (finding a District failed to timely evaluate a Student where it was aware of "red flags" including anxiety and defiance); See also *Jana K. v. Annville-Cleona School District*, 39 F. Supp. 3d 584, 601 (M.D. Pa. 2014) (finding the District had ample reason to suspect a student qualified for IDEA services, specifically emotional disturbance, where there was evidence of poor peer relationships and an inability to form positive peer relationships).

162. Whether a District has acted within a reasonable period of time is a fact-intensive inquiry that is analyzed in light of the information and resources it possessed. Ridley Sch. Dist. v.

M.R., 680 F.3d 260 at 272 (3d Cir. 2012); See also *Lauren G. v. West Chester Area School District*, 906 F. Supp. 2d 375, 385 (E.D. Pa. Nov. 6, 2012) (finding two weeks to be a reasonable period of time).

163. The District waited an entire year before implementing any changes to S.K's accommodations. When it did revise his 504 plan, it did not base those revisions on either an evaluation or other data that explained the changes in S.K.'s behaviors or grades.

164. Hearing Officer Fleming erred when she failed to address the years-long period in which the District was on notice of S.K.'s behaviors but refused to evaluate S.K. or modify his 504 plan. Her decision was void of the fact-intensive inquiry required by the IDEA, Section 504, and the ADA, and silent on the District's failure to timely evaluate Student.

165. The District's failure to conduct a 504 evaluation during the 2023-2024 school year, or recommend an IDEA evaluation, resulted in inappropriate and ineffective interventions that did not provide S.K. the supports he needed to access FAPE.

166. Hearing Officer Fleming further erred by failing to address Parents' claims that the District failed to evaluate S.K. as required by Section 504.

167. In addition, the Hearing Officer erred in denying Parents claims for compensatory education despite the District's failure to timely revise S.K.'s 504 accommodations and ensure that it provided appropriate interventions.

**Eighth Grade: 2024-2025 school year**

168. S.K.'s behaviors persisted in eighth grade.

169. Beginning in September of eighth grade, Parents received reports of S.K.'s defiance, inappropriate Chromebook use, work avoidance, and challenges with peers.

170. S.K.'s report cards continued to reflect below average scores, with grades in the Cs and Ds in core classes like Math, Science, and Social Studies.

171. The District did not propose a 504 re-evaluation or IDEA evaluation. Instead, it decided to merely monitor S.K.'s behaviors and academic decline through a multi-tiered system of support (MTSS) process.

172. Through the MTSS, or child study team, process, the District prolonged an immediate response to S.K.'s behavioral and academic challenges. The MTSS process, which is intended to monitor the Student and their response to intervention, did not lead to either changes to S.K.'s 504 plan or meaningful data collection.

173. In May 2025, Parents hired a special education advocate to help navigate the 504 and GIEP process. At the time they hired the advocate, Parents believed S.K. had an IEP.

174. He did not.

175. At a meeting to discuss the MTSS process, Parents requested that the District evaluate S.K. to determine whether he qualified to receive services under the IDEA. The District claims that it had intended to offer Parents a permission to evaluate at that time, regardless of their request.

176. Parents informed the District that they intended to obtain a comprehensive independent psycho-educational evaluation to determine the extent of S.K.'s needs over the summer.

177. In August 2025, Parent returned the District's signed permission to evaluate and provided the District a copy of the independent psychoeducational report from Dr. Ingrid Boveda.

178. Dr. Boveda's report identified S.K. with autism, ODD, unspecified depressive disorder, and ADHD. It further found that S.K.'s escalating behaviors, need for structure across

environments, and intertwined therapeutic and educational needs necessitated a placement at a therapeutic boarding school for S.K. to access FAPE.

**Ninth Grade: S.K.'s Severe Academic and Behavioral Decline Leads Parents to Enroll S.K. at Telos Academy**

179. S.K. began the 2025-2026 school year in academic free fall.

180. On September 18, 2025 Parents consented to student counseling while the District conducted its initial IDEA evaluation of S.K. But his grades and behaviors continued to worsen.

181. On a near-daily and sometimes daily basis, Parents received calls from S.K.'s teachers about S.K.'s behaviors, which included missing assignments; work avoidance; skipping classes; disrupting classes; defiance; cursing, lying, and stealing; invading the personal spaces of other students; and inappropriately touching other students.

182. By October, S.K. faced multiple detentions and suspensions for his behaviors, which included pulling down the pants of a female student and pushing another student into a locker. The student S.K. pushed into a locker was later taken to the hospital, where they received emergency treatment for their injuries.

183. S.K. spent more time eloping from class, suspended, or in detention than he did in class for the first three months of ninth grade.

184. Parents, to address S.K.'s rapidly declining grades and still-worsening behaviors, requested substantive changes to S.K.'s 504 plan. The 504 team met on October 3, 2025, but the District refused to adopt many of Parent's requested changes.

185. By November, S.K. had received 34 disciplinary referrals and six days of out-of-school suspension.

186. Hearing Officer Fleming nonetheless found that the District's 504 plan was sufficient to provide S.K. with a FAPE during ninth grade. That finding was in error.

187. On October 23, 2025, Parents requested that the District offer S.K. an appropriate educational placement. In their request, Parents emphasized S.K.'s need for a therapeutic boarding school and indicated that they would place S.K. at Telos Academy if the District failed to provide an appropriate placement.

188. The District met to discuss S.K.'s evaluation report and its decision to offer him a placement at Colonial Academy in a full-time emotional support day program. Parents indicated that they were interested in touring the placement and learning more about what Colonial Academy had to offer.

189. On November 5, 2026, before Parents had the opportunity to tour the District's recommended placement, the District issued a NOREP designating Colonial Academy as S.K.''s placement. Neither the IEP or NOREP reflected that that the District considered placements other than Colonial or Telos.

190. When Parents finally had the opportunity to tour Colonial Academy, personnel at Colonial Academy told them that was unable to support S.K.'s academic and behavioral needs.

191. The District's IEP and NOREP were further silent on (1) whether S.K. would receive therapeutic services from Colonial Academy, (2) whether it would conduct a new FBA and behavior plan to address S.K.'s maladaptive behaviors in the Colonial Academy environment, class sizes, training and experience of Colonial Academy Staff, (3) an offer of Parent training and behavior plan to address S.K.'s elopement and behaviors in the home environment, and (4) S.K.'s schedule (including amount of time in unstructured settings).

192. The District's only witness from Colonial Academy testified that they did not know what Parents were told on their tour of the school and could not speak with specificity about

information critical to Parents' decision on the District's proposed placement, such as class size, programming for gifted students, and the amount of therapy/counseling S.K. would receive.

193. Hearing Officer Fleming erred in granting undue weight to the representations of the Colonial Academy witness.

194. At the time Parents made their decision about whether to accept the District's proposed placement, they relied on the representations of Colonial Academy staff, the IEP, and NOREP offered to them.

195. On November 12, 2025, Parents documented their concerns and questions regarding the District's proposed placement in an email to the District. The District's response addressed only a few of Parents' concerns.

196. Parents were therefore without vital information about the programming Colonial would provide to S.K. at the time they had to decide about S.K.'s placement and made the difficult call to send him to Telos. Information that the District and Colonial provided after that point, including some information provided for the first time at hearing, was irrelevant to the question of whether the District's IEP and NOREP in October 2025 offered Student FAPE.

197. Hearing Officer Fleming further erred in concluding that Dr. Boveda's testimony should be granted less weight than District witnesses. The Hearing Officer found all witnesses to be credible, including witnesses from Telos and Dr. Boveda. Dr. Boveda was further recognized as an expert witness. But, without further explanation, the Hearing Officer found that Dr. Boveda's conclusions about S.K.'s programming needs were not supported by the hearing record.

198. As Parents testified, S.K. was in crisis ninth grade year. Parents testified to their concerns that S.K.'s defiance had reached new heights, that he was depressed and may harm himself, and that he had started to elope from home as well as school.

199. Telos witnesses testified to S.K.'s demonstrated need for a therapeutic boarding school like Telos Academy.

200. S.K.'s therapist at Telos spoke to the challenges S.K. demonstrated when he first arrived at Telos: Defiance, depression, anxiety, work-avoidance, executive dysfunction, and negative peer relationships.

201. Like at home, S.K.'s demonstrated challenges persisted in the dorms and led to dysregulation the next day at school.

202. Telos Academy provided 24/7 support for S.K.'s behavioral, academic, and social and emotional challenges. Witnesses, including Dr. Boveda, Parents, and Telos staff, testified to S.K.'s need for a highly structured environment that intergraded therapeutic supports and gathered data regarding S.K.'s behavior across environments to determine the interventions that best supported his needs.

203. In the time S.K. attended Telos, he made significant progress with his executive functioning skills, excelled academically, and began to learn how to build and foster lasting relationships with peers.

204. Hearing Officer Fleming erred in holding that the record did not support S.K.'s need for a full-time therapeutic boarding placement, like Telos.

## CAUSES OF ACTION

### COUNT I: THE IDEA, SECTION 504, AND THE ADA IEE REIMBURSEMENT

205. Parents incorporate the above paragraphs as though fully set forth herein at length.

206. Hearing Officer Fleming erred in denying Parents reimbursement for their IEE.

207. Parents are entitled to reimbursement for the IEE because the District's 2025 initial evaluation report was inappropriate and failed to identify S.K.'s disabilities.

208. Parents are further entitled to reimbursement for the IEE because the District failed to conduct a 504 evaluation despite its suspicions that S.K.'s qualifying disabilities impeded his access to a free and appropriate public education despite accommodations already in place.

209. Parents request an order awarding reimbursement for the IEE they obtained for S.K.

210. In the alternative, Parents request an order requiring the District to fund a new IEE.

### COUNT II: THE IDEA, SECTION 504, AND THE ADA COMPENSATORY EDUCATION PRIOR TO FEBRUARY 2024

211. Parents incorporate the above paragraphs as though fully set forth herein.

212. The Hearing Officer erred in denying Parents claims for compensatory education from September 2016 through February 2024.

213. The District denied S.K. FAPE from September 2016 through February 2024 by failing to evaluate him for special education services despite his ongoing behavioral, academic, social and emotional challenges.

214. The Hearing Officer erred in conflating Parents' contemporaneous knowledge of the underlying actions in their due process complaint with their knowledge that the District violated S.K.'s right to FAPE.

215. The Hearing Officer erred in failing to find a specific knew or should have known date.

216. The District intentionally misled Parents when it claimed that it only evaluated for specific learning disabilities. Its misleading statement prevented Parents from filing for due process when it failed to evaluate S.K. kindergarten year.

217. It further misled Parents when it told Parents that a 504 plan was sufficient to meet S.K.'s needs.

218. Hearing Officer Fleming erred in finding that the District's misrepresentations were merely optimism that S.K. would make progress under a 504 plan.

219. The District knew that it had attempted to support S.K. with accommodations typically included in a 504 plan throughout kindergarten year with no success.

220. Hearing Officer Fleming erred in limiting Parents' claims to actions which occurred after February 2024.

221. Parents ask that the Court reverse Hearing Officer Fleming's KOSHK order, permit the Parties to adduce evidence concerning Parents' erroneously limited claims, and render a decision regarding the relief owed to Parents for the District's denial of a FAPE to S.K. from September 2016 to February 2024.

**COUNT III: THE IDEA, SECTION 504, AND THE ADA COMPENSATORY EDUCATION FOR THE 2023-2024 SCHOOL YEAR**

222. Parents incorporate the above paragraphs as though fully set forth herein.

223. Hearing Officer Fleming erred in failing to consider Parents' claims that the District should have evaluated S.K. as required under section 504 his seventh-grade year or alternatively evaluated S.K. for IDEA services and supports.

224. The District documented S.K.'s continued behavioral, academic, social and emotional challenges during the 2023-2024 school year.

225. S.K.'s 504 plans, District emails, and witness testimony support that S.K.'s behaviors disrupted classes, impeded his relationship with peers, and impacted his grades.

226. Hearing Officer Fleming erred in failing to consider Parents' claims that the District denied S.K. FAPE in seventh grade by failing to adequately address his academic, socio-emotional, and behavioral needs.

227. The Hearing Officer further erred in failing to address the District's delay in evaluating S.K. despite evidence that S.K.'s 504 interventions were insufficient to support his academic needs.

228. S.K. is entitled to compensatory education to remedy the District's denial of FAPE from February 2023 to August 2024.

229. Parents request an order awarding S.K. compensatory education for February 2023 to August 2024.

**COUNT IV: THE IDEA, SECTION 504, AND THE ADA**
**COMPENSATORY EDUCATION FOR THE 2024-2025 SCHOOL YEAR**

230. Parents incorporate the above paragraphs as though fully set forth herein.

231. Hearing Officer Fleming erred in failing to consider Parents' claims that the District should have evaluated S.K. as required under section 504 his eighth-grade year or alternatively evaluated S.K. for IDEA services and supports.

232. The District documented S.K.'s continuing behavioral, academic, social and emotional challenges during the 2024-2025 school year.

233. S.K.'s 504 plans, District emails, and witness testimony support that S.K.'s behaviors disrupted classes, impeded his relationship with peers, and impacted his grades.

234. Hearing Officer Fleming erred in failing to consider Parents' claims that the District denied S.K. FAPE in seventh grade by failing to adequately address his academic, socio-emotional, and behavioral needs.

235. Hearing Officer Fleming erred in finding that initial academic success supported the District's determination that interventions were successful for S.K. As a twice-exceptional student, academic improvement alone is insufficient evidence of whether an intervention is successful.

236. The Hearing Officer further erred in failing to address the District's delay in evaluating S.K. despite evidence that S.K.'s 504 interventions were insufficient to support his academic needs.

237. S.K. is entitled to compensatory education to remedy the District's denial of FAPE for the 2024-2025 school year.

238. Parents request an order awarding S.K. compensatory education for the 2024-2025 school year.

**COUNT V: THE IDEA, SECTION 504, AND THE ADA**
**COMPENSATORY EDUCATION FOR THE 2025-2026 SCHOOL YEAR**

239. Parents incorporate the above paragraphs as though fully set forth herein.

240. Hearing Officer Fleming erred in finding that the District's 504 supports were sufficient to provide S.K. FAPE for the 2025-2026 school year.

241. S.K.'s 504 plans, District emails, disciplinary records and witness testimony support that S.K.'s behaviors continued to disrupted classes, impeded his relationship with peers, and impacted his grades.

242. The Hearing Officer erred in finding that District interventions and S.K.'s 504 plan sufficiently addressed S.K.'s behaviors and resulted in decreased classroom interruptions.

243. S.K. is entitled to compensatory education to remedy the District's denial of FAPE for the 2025-2026 school year.

**COUNT VI: THE IDEA, SECTION 504, AND THE ADA**
**TUITION REIMBURSEMENT FOR THE 2025-2026 SCHOOL YEAR**

244. Parents incorporate the above paragraphs as though fully set forth herein.

245. Hearing Officer Fleming erred in denying Parents tuition reimbursement claims for the 2025-2026 school year.

246. Parents are entitled to tuition reimbursement for the 2025-2026 school year because the District failed to offer S.K. FAPE, Telos Academy is appropriate for S.K., and Parents neither failed to provide the District proper notice nor acted unreasonably.

247. Hearing Officer Fleming erred by relying on witness testimony to supplement the District's programming and placement offered to Parents in the November 2025 NOREP and IEP, rather than determining whether the offer as made provided S.K. a FAPE.

248. Hearing Officer Fleming erred by failing to consider the information available to Parents regarding the District's proposed programming and placement when Parents decided to place S.K. at Telos Academy.

249. Parents request an order awarding tuition reimbursement for the 2025-2026 school year.

**COUNT VII: SECTION 504 AND THE ADA**
**INTENTIONAL DISABILITY DISCRIMINATION**

250. Parents incorporate the above paragraphs as though fully set forth herein.

251. Hearing Officer Fleming erred in failing to consider Parents' claim that the District intentionally discriminated against S.K.

252. The Court should find that the District intentionally discriminated against S.K. because the District had ample evidence, communication from Parents, and its own beliefs that S.K. needed an IEP to access education. It intentionally misled Parents about the scope of District evaluations and refused to evaluate S.K. when his behaviors escalated despite 504 interventions. The District's deliberate inaction and indifference to S.K.'s educational needs constitutes intentional discrimination.

253. Parents request an order finding that the District intentionally discriminated against S.K., a child with disabilities.

**WHEREFORE**, Parents respectfully request that this Court award some or all of the following relief: (1) declare that the District denied S.K. FAPE and/or otherwise discriminated against S.K.; (2) award Parents reimbursement for the IEE they already obtained for S.K., or alternatively, order the District to fund an IEE; (3) admit additional evidence about the 2023-2024, 2024-2025, and 2026-2027 school years, including but not limited to evidence of intentional discrimination; (4) award Parents compensatory education for February 2023 to December 2025; (5) award Parents tuition reimbursement for the 2025-2026 school year; (7) award attorney's fees and costs; and (8) grant any and all other relief that this Court deems appropriate, including, if necessary, an order that enforces S.K.'s stay-put rights under the IDEA.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Princess R. Diaz-Birca*
Princess R. Diaz-Bîrca
Pa. Bar No. 334414
princess@mykidslawyer.com

Michael D. Raffaele
Pa. Bar No. 91615
michael@mykidslawyer.com

RAFFAELE LAW
709 N. 2nd St.
Suite 400, #1003
Philadelphia, PA 19123

*Counsel for Plaintiffs*